**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| DUANE JACOBS, an individual; CAROLYN SUE JACOBS, an individual; JMJ LAND, LLC, a Nebraska limited liability company; LARUE K. MARSHALL, an individual; and HAROLD DEAN MARSHALL, an individual, | ) ) ) ) ) ) ) | CASE NO. 8:11CV106 |
| Plaintiffs, | ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| PT HOLDINGS, INC., a Nebraska corporation; LAWRENCE J. VOLF, an individual; GEORGE MCFADDEN, an individual; LARRY A. BAKER, an individual; and FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as receiver and/or conservator of Sherman County Bank, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the Court on the Objection to Claim (Case No. BK11-40267-TLS, Filing No. 43) and the Motion to Amend Memorandum and Order (Filing No. 48) filed by Plaintiff JMJ Land, LLC ("JMJ"), and the Motion to Dismiss Adversary Proceeding (Case No. A11-4184-TLS, Filing No. 11) filed by Defendant Federal Deposit Insurance Corporation ("FDIC"). For the reasons discussed below, the Objection and Motion to Amend will be denied, and the Motion to Dismiss will be granted in part, and denied in part.

**PROCEDURAL BACKGROUND**

On January 24, 2011, the Plaintiffs filed their Complaint (Filing No. 1-1) with the District Court of Sherman County, Nebraska. On February 4, 2011, JMJ filed for Chapter 12 Bankruptcy ("Bankruptcy Case"). (Case No. BK11-40267-TLS, Filing No. 1.) The FDIC removed the action initiated in Sherman County to this Court ("District Court Action") on March 28, 2011. (Filing No. 1.) On June 6, 2011, JMJ filed a Suggestion of Bankruptcy

(Filing No. 25) that indicated it had filed its Bankruptcy Case.  As a result, this Court referred the District Court Action to the U.S. Bankruptcy Court for the District of Nebraska. (Filing No. 26; Case No. A11-4068-TLS.)

On May 25, 2011, the FDIC filed a proof of claim in the Bankruptcy Case.  (Case No. BK11-40267-TLS, Filing No. 124.)  On June 6, 2011, JMJ filed its Objection (*Id.*, Filing No. 43) to the FDIC's proof of claim, requesting that the FDIC's proof of claim be disallowed.  On July 11, 2011, the FDIC filed a Resistance to JMJ's Objection.  (*Id.* at Filing No. 57.)  One ground on which the FDIC based its resistance was that the Objection had to be brought as an adversary proceeding.  *Id.*

On July 21, 2011, JMJ filed a complaint with the Bankruptcy Court ("Adversary Complaint") to initiate an adversary proceeding ("Adversary Proceeding").  (*Id.* at Filing No. 66; Case No. A11-4184-TLS, Filing No. 1.) Following a hearing on JMJ's Objection, the Bankruptcy Court stated that it would defer ruling on the Objection, and consolidated it with the Adversary Proceeding.  (Case No. BK11-40267-TLS, Filing No. 76.)  On September 26, 2011, the FDIC filed its Motion to Dismiss the Adversary Proceeding ("Adversary MTD") (Case No. A11-4184-TLS, Filing No. 11.)  The Adversary MTD sought dismissal of the Adversary Proceeding under Federal Rules of Civil Procedure 12(b)(1), (6), and (7).  *See also* Fed. R. Bankr. P. 7012.

On August 22, 2011, this Court withdrew the reference of the District Court Action to the Bankruptcy Court, pursuant to the Bankruptcy Court's Report and Recommendation. (Filing Nos. 27, 28.)   On November 28, 2011, pursuant to another Report and Recommendation, this Court withdrew the reference of the Adversary Proceeding to the

2

Bankruptcy Court, and consolidated the Adversary Proceeding with the District Court Action. (Filing Nos. 28, 41.) The Bankruptcy Case is still pending.

On September 16, 2011, the FDIC filed a Motion to Dismiss (Filing No. 30) in the District Court Action ("District Court MTD"), requesting that the Court dismiss the Plaintiffs' claims against the FDIC asserted in the District Court Action. The Court granted the District Court MTD on December 16, 2011. (Filing No. 42.) Because consolidated cases retain their independent statuses, *Horizon Asset Mgmt. v. H & R Block, Inc.*, 580 F.3d 755, 769 (8th Cir. 2009), and the District Court MTD only sought to dismiss the claims asserted against the FDIC in the District Court Action, the Court did not address the Adversary MTD or JMJ's Objection filed in the Bankruptcy Case and consolidated with the Adversary Proceeding. The Court now addresses JMJ's Objection and the Adversary MTD.

## FACTUAL BACKGROUND

### I. General Factual Background[1]

---

[1]The Court derives the facts underlying this action from the facts as alleged in the Adversary Complaint. (Case No. A11-4184, Filing No. 1.) JMJ stated that it filed its Adversary Complaint to eliminate the FDIC's contention that JMJ's Objection had to be overruled under Fed. R. Bankr. P. 3007(b) because it included certain requests for relief that had to be brought in an adversary proceeding. *See* Fed. R. Bankr. P. 3007(b), 7001. Rule 3007(b) states that "[a] party . . . shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding." Fed. R. Bankr. P. 3007(b). This mandatory language "was added in 2007," and replaced "what used to be the last sentence of Rule 3007 . . . which read: 'If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding." 9 Collier on Bankruptcy ¶ 3007.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see Halverson v . Cameron* (*In re Mathiason*), 16 F.3d 234, 237 (8th Cir. 1994) (alteration in original) (referring to Rule 3007 prior to addition of mandatory language in 2007 and stating "Bankruptcy Rule 3007, governing objections, provides in part '[i]f an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.'"). Given the mandatory language in Rule 3007(b), that the Objection and the Adversary Complaint are nearly identical, and that JMJ has represented that it filed the Adversary Complaint in response to the FDIC's contention that the Objection had to be brought in an adversary proceeding, the Court will deny the Objection and limit its analysis to the Adversary MTD. *See* 9 Collier on Bankruptcy ¶ 3007.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (stating that Rule 3007(b)'s mandatory language may subject an objection that includes an improper request for relief to dismissal.); 10 Collier on Bankruptcy ¶ 7001.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Failure to commence an adversary proceeding when seeking the relief of the kind listed in Rule 7001has resulted in denial of the motion or dismissal of the proceeding.").

For purposes of the pending Adversary MTD, the factual assertions in the Adversary Complaint are accepted as true, although the Court need not accept JMJ's conclusions of law.

In 1999, Prime Trading Company, Inc. ("PTC"), began offering commodities brokerage services in Sherman County, Nebraska. Defendant Lawrence J. Volf, was a fifty-percent owner and the president of PTC. Volf started PTC in connection with Sherman County Management, Inc., the holding company of Sherman County Bank ("Bank"), to help farmers with their commodities trading by hedging the risk of decreasing commodity prices while achieving the maximum value for their commodities. Until this Court entered a Consent Order (Case No. 4:4CV3184, Filing No. 127) on December 17, 2007, prohibiting him from doing so, Volf represented to farmers that he had a special expertise in commodities trading. Relying on his representations, farmers would authorize him and PTC to buy and sell both actual commodities and options on futures contracts.

After entry of the Consent Order, Volf sold his fifty-percent ownership interest in PTC to Defendant PT Holdings, Inc., which had previously acquired the other fifty-percent interest in PTC from Sherman County Management. PT Holdings purchased the fifty-percent interest in PTC from Volf using little, if any, cash, intending to make payments to Volf based on its profits from PTC's continuing business operations. Volf sold his interest in PTC so he could continue to act as an officer and director of the Bank. Defendant Larry

---

The Court also considers certain materials that are embraced by the pleadings and/or otherwise part of the public record that do not contradict the Adversary Complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (quoting *Mo. ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999), *cert. denied*, 527 U.S. 1039 (1999); *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn.1997)) ("the court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint,' as well as materials that are 'necessarily embraced by the pleadings.'").

A. Baker helped form PT Holdings to hold PTC's assets and to run PTC's operations under different ownership and management. Despite the Consent Order, Volf continued to participate in PT Holdings' decision-making processes and to bring in customers for PT Holdings. Volf also, together with Baker and PT Holdings, helped manage and direct the accounts of PT Holdings' customers. Defendant George McFadden, while acting as an officer and director of the Bank, also brought in customers for PT Holdings.

As a way to allow PT Holdings to make certain trades on their behalf, PT Holdings' customers opened accounts with Rosenthal Collins Group, L.L.C. ("Rosenthal"). PT Holdings represented to its customers that when making these trades, it intended to reduce their risk of decreasing soybean and corn prices by implementing hedging strategies. However, PT Holdings increased its customers' risk by engaging in speculative transactions, inconsistent with the hedging strategies it had described to its customers. Volf, Baker, and PT Holdings failed to contact many of its customers to obtain authorization to execute these speculative transactions.

Plaintiffs Duane and Carolyn Sue Jacobs were customers of PT Holdings who opened accounts with Rosenthal, and to whom PT Holding represented that it intended to hedge their risk related to decreasing commodity prices. The Jacobses, the Bank, and Rosenthal entered into a security agreement, also known as the "three-way agreement,"[2] on or about January 17, 2007, that authorized the Bank to transfer funds from the Jacobses' account with the Bank and into their account with Rosenthal. (Case No. A11-4184-TLS, Filing No. 5.) That security agreement stated:

---

[2]JMJ has alleged that the security agreement has been referred to as "3-way agmt.," "3 way agmt.," and "3-way." (Case No. A11-4184, Filing No. 1, ¶ 56, 65, 66.)

> Secured Party hereby agrees to advance to Debtor certain sums of money for the purpose of hedging his inventory of certain commodities. Debtor agrees to deposit said sums in an account with Broker . . . and agrees to employ said funds for the sole purpose of making hedging transactions to protect his commodity inventory and shall not employ said funds for transactions of speculation or investment in commodities futures.

*Id.* The security agreement listed the Bank as the "Secured Party," Duane Jacobs as the "Debtor," and Rosenthal as the "Broker." *Id.*

Bank officers advanced funds to the Jacobses' account with the Bank pursuant to certain line-of-credit promissory notes, and then transferred the amount of those advances out of the account with the Bank and into the Jacobses' account with Rosenthal. The Jacobses had no knowledge that the advances were made into their Bank accounts or that those amounts were then transferred into their Rosenthal account. Through the Jacobses' Rosenthal account, PT Holdings executed speculative trades instead of executing trades based on hedging principles. The Bank officers that executed these transfers from the Bank to Rosenthal pointed to the three-way agreement as their authority for making such transfers. Only after advancing funds into the Jacobses' Bank account and transferring those funds into the Jacobses' Rosenthal account would the Bank request the Jacobses to sign a promissory note. If the Jacobses questioned this conduct, the Bank would threaten to stop providing them with credit.

Sometime towards the end of the 2008 calendar year, on the verge of failing, the Bank attempted to generate capital. The Bank did so by executing additional speculative trades out of its customers' Rosenthal accounts, including the Jacobses' Rosenthal account. Despite its attempt to generate capital, the Bank failed. The Bank closed, and on or about February 13, 2009, the FDIC was appointed its receiver. Thereafter, the FDIC

6

entered into settlement agreements with all of PT Holdings' customers except the Jacobses. An FDIC representative told the Jacobses that their claim would be settled. However, the FDIC refused to settle with the Jacobses after the date for filing administrative claims with the FDIC had passed.

On or about September 16, 2010, the FDIC filed notices of default in Valley County, Nebraska. The Notices of default stated that the trustee of certain deeds of trust had elected to sell real property owned, at least in part, by the Jacobses and JMJ to satisfy obligations the Jacobses owed to the FDIC as receiver of the Bank. In calculating the amounts the Jacobses owed to it, the FDIC included the money unilaterally transferred out of the Jacobses' Bank account and into the Jacobses' account with Rosenthal.

## II. Factual Background Specific to the FDIC's Proof of Claim

The FDIC based its proof of claim (Case No. BK11-40267, Filing No. 124) on a trust deed that secured loans the Bank alleged it made to the Jacobses. The Jacobses signed thirteen promissory notes stating that they promised to pay back the Back various amounts of money. (Case No. A11-4184, Filing No. 4.) Ten out of the thirteen promissory notes contained a "line of credit" provision. Two provided for a straight line of credit, the other eight provided for a revolving line of credit. The straight line of credit provisions stated:

> **LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of principal has been advanced, [the Jacobses are] not entitled to further loan advances. Advances under this Note may be requested either orally or in writing by [the Jacobses] or as provided in this paragraph. [The Bank] may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to [the Bank] are to be directed to [the Bank's] office . . . [The Jacobses] agree to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person; or (B) credited to any of [the Jacobses'] accounts with [the Bank]. The unpaid principal balance owing on

7

this Note at any time may be evidenced by endorsements on this Note or by [the Bank's] internal records, including computer print-outs.

(*Id.* at 3-4, 11-12.)  The revolving line of credit provisions are identical to the straight line of credit provisions except that the revolving line provisions do not contain the second sentence contained in the straight line provision, which reads "[o]nce the total amount of principal has been advanced, [the Jacobses are] not entitled to further loan advances." (*Id.* at 7-10, 13-26.)

The Trustors of the trust deed were the Jacobses and Plaintiffs Larue K. and Harold Dean Marshall.  The Bank was both the lender and beneficiary under the trust deed.  The proof of claim alleged that the Jacobses and the Marshalls transferred the property subject to the trust deed to JMJ without satisfying the obligations secured by the trust deed.  The trust deed stated: "THIS DEED OF TRUST . . . IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST." (Case No. BK11-40267-TLC, Filing No. 124, at 28.)  The trust deed defined the term "Indebtedness" as follows:

[A]ll principal, interest, and other amounts, costs and expenses payable under the Note or Documents and any amounts expended or advanced by Lender to discharge the Trustor[s'] obligations or expenses incurred by Trustee or Lender to enforce Trustor[s'] obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of trust. Specifically, without limitation, indebtedness includes the future advances set forth in the Future Advances provision of this Deed of Trust, together with all interest thereon.

*Id.* at 33.  The trust deed defined the term "Note" as "the promissory note dated March 29, 2007, **in the original principal amount of $350,000.00** from [the Jacobses] to Lender,

together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement." *Id.* (emphasis in original). The trust deed defined the term "Related Documents," as "all promissory notes, credit agreements, loan agreements, environmental agreements, guarantees, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness." *Id.* The "Future Advances" provision of the trust deed stated:

> **FUTURE ADVANCES.** In addition to the Note, the Deed of Trust secures all future advances made by Lender to Trustor[s] whether or not the advances are made pursuant to a commitment. Specifically, without limitation, the Deed of Trust secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Borrower, together with all interest thereon.

*Id.* at 28.

## III. Additional Facts for 12(b)(1) Analysis

For purposes of resolving the Adversary MTD under Rule 12(b)(1), the allegations in the Adversary Complaint are supplemented by the following facts evidenced in the record. *Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

In its capacity as receiver for the Bank, the FDIC established May 26, 2009, as the deadline for filing administrative claims against the Bank. (Case No. A11-4184-TLS, Filing No. 13, at ¶ 5.) To provide notice of this May 26 deadline to potential claimants, the FDIC mailed individual notices of the deadline to all individuals and entities that the Bank's books indicated were its creditors, and published notice of the deadline in the *Grand Island*

9

*Independent*, *Sherman County Times*, and *The Phonograph Herald* newspapers. (*Id.*) None of the Plaintiffs was identified in the Bank's books as a Bank creditor. None of the Plaintiffs submitted a claim against the Bank to the FDIC. (*Id.* at ¶¶ 6-7.)

## DISCUSSION

The Adversary Complaint states four "claims" against the FDIC. "Claims" one and two seek a declaration that (1) the transfers made under the security agreement were unauthorized, and therefore invalid and not due to the FDIC, and (2) the FDIC's interest as receiver for the Bank in the real property underlying the trust deed should be reduced by the amount of the unauthorized transfers. "Claim" three seeks to void the Bank's security interest in the real property underlying the trust deed based on a fraudulent transfer theory. "Claim" four seeks to subordinate the FDIC's interest in the real property underlying the trust deed based on a theory of equitable subordination.

The FDIC contends that the Adversary Complaint must be dismissed for lack of subject matter jurisdiction because JMJ failed to satisfy the administrative exhaustion requirements imposed by the Financial Institution Reform, Recovery, and Enforcement Act ("FIRREA"). *See* 12 U.S.C. § 1821(d)(3)-(13). The FDIC also contends that the Adversary Complaint must be dismissed because the "claims" JMJ has asserted against the FDIC are barred by 12 U.S.C. § 1823(e).[3] Because the Court finds that it lacks subject matter jurisdiction over JMJ's equitable subordination claim and that JMJ's fraudulent transfer

---

[3] Although the FDIC has not indicated whether it has moved to dismiss the Adversary Complaint based on 12 U.S.C. § 1823(e) under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), other courts that have evaluated a motion to dismiss based on § 1823(e) have done so under Rule 12(b)(6). *See generally Caires v. JP Morgan Chase Bank*, 745 F. Supp. 2d 40 (D. Conn. 2010); *Fairfield Six/Hidden Valley P'ship v. Resolution Trust Corp.*, 860 F. Supp. 1085 (D. Md. 1994); *Wash. Props. Ltd. P'ship v. Resolution Trust Corp.*, 796 F. Supp. 542 (D.D.C. 1992). This Court will do the same.

10

"claim" is barred by § 1823(e), the Court does not address the FDIC's alternative arguments for dismissal specific to those requests for relief.

## I. Standards

### A. 12(b)(1)

A motion under Federal Rule of Civil Procedure 12(b)(1) "challenges whether the [Court] has subject matter jurisdiction to hear the matter." *Johnson*, 534 F.3d at 964. The party asserting jurisdiction bears the burden of proving that jurisdiction is proper. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). The Court, however, has "'wide discretion'" to decide the process with which its jurisdiction can best be determined. *Johnson*, 534 F.3d at 964 (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)). It "has the authority to dismiss an action for lack of subject matter jurisdiction on any one of three separate bases: '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Id.* at 962 (quoting *Williamson*, 645 F.2d at 413); *see also Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008) (stating that "[m]otions to dismiss for lack of subject-matter jurisdiction can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts").

### B. 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A]lthough a complaint need not include detailed factual allegations, 'a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 629-30 (8th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Instead, the complaint must set forth 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 630 (citing *Twombly*, 550 U.S. at 570).

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 716 (8th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009)). "'Courts must accept . . . specific factual allegations as true but are not required to accept . . . legal conclusions.'" *Outdoor Cent., Inc. v. GreatLodge.com, Inc.,* 643 F.3d 1115, 1120 (8th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement will not suffice." *Hamilton v. Palm*, 621 F.3d 816, 817-18 (8th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). The complaint's factual allegations must be "sufficient to 'raise a right to relief above the speculative level.'" *Williams v. Hobbs,* 658 F.3d 842, 848 (8th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

When ruling on a defendant's motion to dismiss, a judge must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 555 & 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). The complaint, however, must still "include

sufficient factual allegations to provide the grounds on which the claim rests." *Drobnak v. Andersen Corp.,* 561 F.3d 778, 783 (8th Cir. 2009).

"Two working principles underlie . . . *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly,* 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II. FIRREA Exhaustion Requirement

### A. Law

Section 1821(d)(13)(D) of FIRREA imposes a jurisdictional bar, except as specifically provided elsewhere in 12 U.S.C. § 1821(d), to requests for relief that fall into any one of the following four categories:

> (1) claims for payment from assets of any depository institution for which the [FDIC] has been appointed receiver; (2) actions for payment from assets of such depository institution; (3) actions seeking a determination of rights with respect to assets of such depository institution; and (4) a claim relating to an act or omission of such institution or the [FDIC] as receiver.

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 393 (3d Cir. 1994).[4] Exhaustion is required for these types of claims or actions whenever "the genesis

---

[4]Since the FIRREA does not define the term "assets," the Court will "refer to the term 'assets' in common legal usage.'" *Nat'l Union Fire*, 28 F.3d at 384. The term "asset" has been defined as:

> **1.** An item that is owned and has value. **2.** (*pl.*) The entries on a balance sheet showing

13

of [the] claim is the prereceivership misconduct by the failed bank[ ]"[5] regardless of whether the claimant is a debtor or a creditor of the failed institution for which the FDIC was appointed receiver. *Tri-State Hotels, Inc. v. Fed. Deposit Ins. Corp.*, 79 F.3d 707, 713, 714 (8th Cir. 1996).

The only provision within 12 U.S.C. § 1821(d) that states a court of the United States has jurisdiction over a claim against the FDIC as receiver is 12 U.S.C. § 1821(d)(6). That provision "provides that courts have jurisdiction over claims that have first been presented to the FDIC under its administrative review process." *Id.* at 712 (citing 12 U.S.C. § 1821(d)(6)(A)); *see also* 12 U.S.C. §1821(d)(5)(A)(I), (6).[6]  When this claims-handling

---

the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill. **3.** (*pl.*)  All the property of a person . . . available for paying debts or for distribution.

Black's Law Dictionary 125-26 (8th ed. 2004).

[5]The Eighth Circuit has not decided the issue of whether the exhaustion requirement applies to claims arising from postreceivership conduct. *Tri-State Hotels, Inc. v. Fed. Deposit Ins. Corp.*, 79 F.3d 707, 713 n.8 (8th Cir. 1996). JMJ has not asserted in the Adversary Complaint that their requests for relief against FDIC as receiver arise from postreceivership misconduct, and all of the allegations and claims in the Complaint appear to relate only to prereceivership conduct.

[6]12 U.S.C. § 1821(d)(6), in relevant part, states:

Before the end of the 60-day period beginning on the earlier of --

(I) the end of the period described in paragraph (5)(A)(I) with respect to any claim against a depository institution for which the [FDIC] is receiver; or
(ii) the date of any notice of disallowance of such claim pursuant to paragraph (5)(A)(I),

the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) or file suit (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).

*Id.*  12 U.S.C. § 1821(d)(5)(A)(I) states: "Before the end of the 180-day period beginning on the date any claim against a depository institution is filed with the [FDIC] as receiver, the [FDIC] shall determine whether to allow or disallow the claim and shall notify the claimant of any determination with respect to such claim." *Id.*

provision is read together with the jurisdictional-bar provision, the "two provisions mandate that 'administrative exhaustion is required before any court acquires subject matter jurisdiction over a claim' against the FDIC as receiver for a failed thrift." *Tri-State*, 79 F.3d at 712 (quoting *Bueford v. Resolution Trust Corp.*, 991 F.2d 481, 484 (8th Cir. 1993)).

FIRREA's administrative exhaustion requirement applies only to "claims" or "actions" against the FDIC as receiver; it does not apply to "true affirmative defenses." *Tri-State*, 79 F.3d at 715 (citing *Nat'l Union Fire*, 28 F.3d at 392-95). "However, a court must look beyond the nomenclature of a request for relief to ascertain whether it is a true affirmative defense or is, in actuality, a claim requiring exhaustion as a prerequisite to jurisdiction. Whether a request for relief is titled an affirmative defense . . . is not dispositive." *Am. First Fed., Inc. v. Lake Forest Park, Inc.*, 198 F.3d 1259, 1264 (11th Cir. 1999); *see also RTC Mortg. Trust 1994-N2 v. Haith*, 133 F.3d 574, 580 (8th Cir. 1998) (quoting *Tri-State*, 79 F.3d at 713 n.9) ("'If plaintiff brings an action against the assets of the failed institution, then FIRREA's exhaustion requirement is applicable, regardless of how plaintiff styles its claim.'").

The Eighth Circuit has shed light on the issue of how one distinguishes between a "claim" or "action" on the one hand, and a "true affirmative defense" on the other. In *Tri-State*, the Eighth Circuit rejected the plaintiff's assertion that failing to grant the declaratory relief it requested would leave the plaintiff defenseless in any action against it by the receiver, and found that the request for declaratory relief was subject to FIRREA's administrative exhaustion requirement. *Id.* (citing *Nat'l Union Fire*, 28 F.3d at 392-95; *Midwest Fed. Sav. Bank*, 36 F.3d at 792). In doing so, the Eighth Circuit expressly relied

15

on the Third Circuit's decision in *National Union Fire* in which "the Third Circuit held that, while petitioner was barred from offensively bringing a declaratory judgment action or suit for rescissory relief, it could still raise any affirmative defenses it had against the [receiver] in any suit by the [receiver]." *Id.* The Eighth Circuit noted the Third Circuit's reasoning for this proposition: "[Section] 1821(d)(13)(D) bars 'any claims' seeking payment or 'any action seeking a determination of rights'; thus, affirmative defenses, which technically are 'responses' and not 'claims' or 'actions,' are not covered by FIRREA and need not first be submitted for administrative review." *Id.* at 715 n.13.[7]

"One of the important goals of FIRREA is to enable the receiver to efficiently determine creditors' claims and preserve assets of the failed institution without being burdened by complex and costly litigation." *Nat'l Union Fire*, 28 F.3d at 388; *see also Tri-State*, 79 F.3d at 712 (quoting H.R.Rep. No. 101-54(I) 101st Cong. 1st Sess., at 418-19, *reprinted in* 1989 U.S.C.C.A.N. 86, 215) (stating the FIRREA "enabl[es] the FDIC to dispose of the bulk of claims against failed financial institutions expeditiously and fairly . . . without unduly burdening the District Courts."). However, once "the FDIC has . . . chosen a judicial forum in which to prosecute its rights, the policy of avoiding unnecessary litigation is no longer applicable, and the party's Due Process rights to defend the claims in the FDIC's lawsuit become paramount." *Tri-State*, 79 F.3d at 715 n. 13 (citing *Nat'l*

---

[7]Other courts have similarly noted the difference between "defenses" and "claims" or "actions." *See Am. First Fed.*, 198 F.3d at 1264 (11th Cir. 1999) (citing Black's Law Dictionary 38 (6th ed. 1991); *Nat'l Union Fire*, 28 F.3d at 393) (stating "an affirmative defense . . . is[ ] 'a response to a plaintiff's claim which attacks the plaintiff's *legal* right to bring an action'" and noting that "a claim is 'essentially an action which asserts a right to payment.'"); *Resolution Trust Corp. v. Love*, 36 F.3d 972, 976 (10th Cir. 1994) (citing Black's Law Dictionary (5th ed. 1979)) ("The word 'claim,' used as a noun as it is in the relevant statute, ordinarily means a 'cause of action.' The word 'action' 'in its usual legal sense means a suit brought in a court' or 'a formal complaint within the jurisdiction of a court of law.' Affirmative defenses do not seek payment nor are they 'claims' or 'actions,' i.e. causes of action.").

16

*Union Fire*, 28 F.3d at 394).  Therefore, although a "party wishing to bring [a declaratory] action . . . must . . . wait and see if the [receiver] will sue her.  If it does, then she will be able to defend herself against the [receiver's] action at that time."  *Id.*  The Third Circuit explained that the FIRREA claim-handling procedures "result only in a *delay* in adjudication" until the party puts its claim through the administrative claims procedure or until the receiver brings suit against the party.  *Id.* at 389, 394 n.27 (emphasis in original).

When it concluded in a non-bankruptcy context that FIRREA's administrative exhaustion requirement "was intended to apply to debtors as well as creditors," the Eighth Circuit in *Tri-State* expressly "reject[ed] [the plaintiff's] reliance on a line of bankruptcy cases holding that debtors are not covered by FIRREA."  *Tri-State*, 79 F.3d at 714 n. 11. The Eighth Circuit stated that in so concluding, however, it did not "decide the applicability of FIRREA to bankruptcy cases."  *Tri-State*, 79 F.3d at 714 n.11.  Nevertheless, FIRREA states that it "bars '*any* claim or action for payment from, or *any* action seeking a determination of rights with respect to the failed institution's assets' unless administrative remedies have been exhausted," *Tri-State*, 79 F.3d at 714 (emphasis in original) (quoting 12 U.S.C. § 1821(d)(13)(D)), and "[t]he fact that the claim is associated with a bankruptcy proceeding does not suddenly render [FIRREA's] language ambiguous."  *Superior Bank, FSB v. Boyd* (*In re Lewis*), 398 F.3d 735, 742 (6th Cir. 2005).  Thus, the plain language of FIRREA indicates that it applies to any claim or action, regardless of who is asserting or bringing it, even if it is a debtor in bankruptcy.  Therefore, there is no "debtor-in-bankruptcy" exception to FIRREA's administrative exhaustion requirement.

17

Although FIRREA's exhaustion requirements apply regardless of whether a party is a debtor in bankruptcy, a debtor in bankruptcy will still be entitled to assert true affirmative defenses to a claim made against it without subjecting those defenses to the administrative exhaustion requirement.   *See Tri-State*, 79 F.3d at 715 (citing *Nat'l Union Fire*, 28 F.3d at 392-95) (stating that FIRREA's administrative exhaustion requirement does not apply to true affirmative defenses).  A concept unique to the bankruptcy process is the allowability of a creditor's claim.  4 Collier on Bankruptcy ¶ 502.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Section 502(a) of the Bankruptcy Code states that "[a] claim . . ., proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Thus, upon the filing of a proof of claim, "the claim is deemed allowed and the proof constitutes prima facie evidence of [its] validity and amount."  *In re Be-Mac Transp. Co., Inc.*, 83 F.3d 1020, 1025 (8th Cir. 1996) (citing 11 U.S.C. § 502(a), (b); Fed. R. Bankr. P. 3001(f)).  If a party objects to a proof of claim, "the court must then . . . determine in what amount the contested claim should be allowed.  If the court determines the lien is invalid and denies the claim, the creditor will lose the lien by operation of the doctrine of collateral estoppel."  *Id.*  (citing 11 U.S.C. § 502 (b); *In re Tarnow*, 749 F.2d 464, 465 (7th Cir. 1984)).  Furthermore, "the filing of a proof of claim is tantamount to the filing of a complaint in a civil action, and the . . . formal objection to the claim, the answer."  *In re Simmons*, 765 F.2d 547, 552 (5th Cir. 1985) (citing *Nortex Trading Corp. v. Newfield*, 311 F.2d 163 (2d Cir. 1962); 3 Collier on Bankruptcy ¶ 502.01 (15th ed. 1985)); *see also* 9 Collier on Bankruptcy ¶ 3007.01[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

18

Thus, in a bankruptcy case, an objection is how a party responds to the filing of a proof of claim, which is evidence of the validity and amount of a claim.  As a result, a party objecting to the validity and/or amount of the claim evidenced by the proof of claim should be able to assert any defense that attacks the validity and/or amount of the claim without subjecting those defenses to the FIRREA's administrative exhaustion requirements.[8]  However, this does not mean that counterclaims joined with the objection, thereby requiring the objection be brought in an adversary proceeding, *see* Fed. R. Bankr. P. 3007(b), are not subject to FIRREA's administrative exhaustion requirement.  *See  Tri-State*, 79 F.3d at 715 (citing *Nat'l Union Fire*, 28 F.3d at 392-95); *Am. First Fed.*, 198 F.3d at 1264; *Haith*, 133 F.3d at 580(quoting *Tri-State*, 79 F.3d at 713 n.9).

## B.  Analysis

"Claims" one and two seek a declaration that (1) the transfers made under the security agreement were unauthorized, and therefore are invalid and not due to the FDIC, and (2) that the FDIC's interest as receiver in the real property underlying the Bank's trust deed should be reduced by the amount of the unauthorized transfers.  "Claim" three seeks to void the Bank's security interest in the real property underlying the trust deed based on a fraudulent transfer theory.   A close reading of these claims reveals that these "claims"

---

[8]*Compare Tri-State*, 79 F.3d at 715, n.13 (citing *Nat'l Union Fire*, 28 F.3d at 392-95) (stating that the FIRREA's administrative exhaustion requirement does not apply to true affirmative defenses and that once "the FDIC has . . . chosen a judicial forum in which to prosecute its rights, the policy of avoiding unnecessary litigation is no longer applicable, and the party's Due Process rights to defend the claims in the FDIC's lawsuit become paramount."), *and Nat'l Union Fire*, 28 F.3d at 393) (stating "an affirmative defense . . . is[ ] 'a response to a plaintiff's claim which attacks the plaintiff's *legal* right to bring an action'" and noting that "a claim is 'essentially an action which asserts a right to payment.'"), *with In re Simmons*, 765 F.2d at 552 ("the filing of a proof of claim is tantamount to the filing of a complaint in a civil action, and the . . . formal objection to the claim, the answer."), *and  In re Be-Mac Transp.*, 83 F.3d at 1025(citing 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f)) ("Once a proof of claim is filed, the claim is deemed allowed and the proof constitutes prima facie evidence of the claim's validity and amount. In order to disallow the claim, the debtor or another party in interest must object.").

are not "claims" or "actions" subject to FIRREA's administrative exhaustion requirement. Regardless of how they are titled, these "claims" are all responses to the FDIC's proof of claim that attack the validity and amount of the FDIC's claim evidenced therein.  Now that the FDIC has chosen its judicial forum and decided that it was necessary to litigate the validity and amount of its claim, "claims" one, two, and three, are not barred by FIRREA's administrative exhaustion requirement even though JMJ has not subjected them to the administrative claims-handling process.[9]

"Claim" four seeks to subordinate the FDIC's interest in the real property underlying the trust deed based on a theory of equitable subordination.  Unlike "claims" one, two, and three, "claim" four does not attack the validity or amount of the FDIC's claim evidenced in its proof of claim.  It attacks the relative priority of the FDIC's claim to the real property underlying the trust deed, and could be brought against the FDIC independent of any action the FDIC could bring against JMJ.  Furthermore, JMJ's "equitable subordination" claim states that JMJ seeks to subordinate the FDIC's interest due to allegedly inequitable conduct occurring prior to FDIC being appointed receiver.  Thus, this claim relates to the Bank's "acts or omissions."  *See* 12 U.S.C. § 1821(d)(13)(D)(ii).  Therefore, JMJ's "equitable subordination" claim was subject to FIRREA's exhaustion requirement.  *See*

---

[9]*See  Tri-State*, 79 F.3d at 715 n. 13 (citing *Nat'l Union Fire*, 28 F.3d at 394) (stating once "the FDIC has . . . chosen a judicial forum in which to prosecute its rights, the policy of avoiding unnecessary litigation is no longer applicable, and the party's Due Process rights to defend the claims in the FDIC's lawsuit become paramount."); *Nat'l Union Fire*, 28 F.3d at 388, 389, 394 n.27 (stating that although a "party wishing to bring [a declaratory] action . . . must . . . wait and see if the [receiver] will sue her.  If it does, then she will be able to defend herself against the [receiver's] action at that time."); *Congress Credit Corp. v. AJC Int'l*, 186 B.R. 555, 559 (D.P.R. 1995) (citing 2 David S. Epstein et al., Bankruptcy § 6–79 (1992)) ("An 'avoidance' of a transfer under section 547 is different from the 'recovery' of the property under section 550.  An avoidance nullifies the transfer. As a result, the transferred property becomes a part of the estate automatically.  A recovery, on the other hand, forces the transferee to return the property or become personally liable for its value."); *In re Roco Corp.*, 701 F.2d 978, 981 (1st Cir. 1983) ("The bankruptcy court rendered a judgment for the Trustee based on the affirmative defense of fraudulent transfer").

20

*Lloyd v. Fed. Deposit Ins. Corp.*, 22 F.3d 335, 336-37 (1st Cir. 1994) (finding that requests to reform a mortgage "lie in the maw of [§ 1821(d)(13)(D)], for in the statutory parlance, the plaintiff's complaint 'seeks a determination of rights with respect to [ ] the assets of a[ ] depository institution for which the [FDIC] has been appointed receiver.'") (quoting 12 U.S.C. § 1821(d)(13)(D)) (second and third alterations in original). Accordingly, because JMJ has not alleged, asserted, or pointed to any evidence indicating that it has complied with FIRREA's administrative exhaustion requirement or that it did not receive notice of the FDIC being appointed receiver in time to file its claim,[10] the FDIC's Adversary MTD is granted as it relates to JMJ's "equitable subordination" claim.  *See   Haith*, 133 F.3d at 579(quoting 12 U.S.C. § 1821(d)(5)(C)); *see also Hanson v. Fed. Deposit Ins. Corp.*, 113 F.3d 866, 871 (8th Cir. 1997) (quoting *Freeman v. Fed. Deposit Ins. Corp.*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) (Section 1821(j) . . . 'effect[s] a sweeping ouster of courts' power to grant equitable remedies . . . .'") (alteration in original) (citing *Tri-State*, 79 F.3d at 715); 12 U.S.C. § 1821(j) ("Except as provided in this section, no court may take any action, except at the request of the Board of Directors [of FDIC] by regulation or order, to restrain or affect the exercise of powers or functions of [FDIC] as a . . . receiver."); *see also* 12 U.S.C. § 1813(k).

---

[10]*See Haith*, 133 F.3d at 579 (stating that "[t]he only exception to the strict requirement of exhaustion of remedies[ is] where the claimant does not receive notice of the appointment of the receiver in time to file his claim.").

### III.  12 U.S.C. § 1823(e)

#### A.  Law

Section 1823(e)[11] was enacted to serve two purposes.  *Fed. Deposit Ins. Corp. v. Va. Crossings P'ship*, 909 F.2d 306, 309 (8th Cir. 1990) (citing *Langley v. Fed. Deposit Ins. Corp*, 484 U.S. 86 (1987)).  First, it was enacted "'to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.'"  *Id.* (quoting *Langley*, 484 U.S. at 91-92).  Second, it was enacted to "'[to] ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.'"  *Id.* (alteration in original) (quoting *Langley*, 484 U.S. at 91-92).

Section 1823(e) serves these purposes by "protect[ing] the FDIC from claims based upon agreements which decrease the FDIC's interest in an asset," *Hanson v. Fed. Dep. Ins. Corp.*, 13 F.3d 1247, 1251 (8th Cir. 1994) (citing 12 U.S.C. § 1823(e); *Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 90 (1987)), when the FDIC "acts as receiver for a failed

---

[11]

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement--

(A) is in writing,

(B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(D) has been, continuously, from the time of its execution, an official record of the depository institution.

11 U.S.C. § 1823(e).

22

bank." *DiVall Insured Income Fund Ltd. P'ship v. Boatmen's First Nat'l Bank of Kan. City*, 69 F.3d 1398, 1401 (8th 1995). It "requires that any agreement upon which a claim is based be memorialized in the bank's records and also be approved by 'officially recorded action' on the part of the bank's board or loan committee." *Hanson*, 13 F.3d at 1251 (quoting *Langley*, 484 U.S. 86, 92 (1987)). In other words, a claim against the FDIC based on an agreement will be barred unless the "agreement is (1) in writing, (2) between the bank and the claimant and executed contemporaneously with the acquisition of the asset, (3) approved and recorded by the appropriate bank committee, and (4) from its inception is an official bank record." *Hanson*, 13 F.3d at 1251 (citing 12 U.S.C. § 1823(e)).

### B. Analysis

The FDIC does not contend that the security agreement failed to meet § 1823(e)'s requirements. Instead, the FDIC contends that the security agreement is not the same document as the "three-way agreement," and that the Adversary Complaint does not allege that the "three-way agreement" satisfied § 1823(e)'s requirements. The relief JMJ requested under "claims" one and two is based solely on allegations that the Bank lacked authority to transfer funds from the Jacobses' account with Bank to their account with Rosenthal in order to execute speculative trades. JMJ alleged that the only authority the Bank had to transfer the Jacobses' funds would have been derived from the security agreement entered into between the Jacobses, the Bank, and Rosenthal, which JMJ has alleged to be the same document as the "three-way agreement," and the Court must accept this allegation as true for purposes of the Adversary MTD. *See Outdoor Cent.*, 643 F.3d at 1120 (quoting *Twombly*, 550 U.S. at 556). JMJ contends that the security

agreement was the only document that provided the Bank with authority to make transfers from the Jacobses' Bank account and into their Rosenthal account, that it did not provide such authority unless it was for the purpose of entering into hedging transactions on the Jacobses' behalf, and that the Jacobses did not otherwise grant the Bank authority to enter into speculative transactions. Thus, JMJ has alleged that the relief it requests under "claims" one and two is based on the written security agreement executed by the Bank and JMJ.

JMJ has not expressly alleged that the security agreement was approved and recorded by the appropriate bank committee or that the security agreement was an official bank record from its inception. However, JMJ has alleged that the Bank participated in the execution of the security agreement and used it as its authority to make unauthorized transfers on the Jacobses' behalf, the agreement appears to be signed on behalf of the Bank, and the FDIC does not contend that the security agreement itself failed to meet § 1823(e)'s requirements. Thus, JMJ has asserted facts sufficient to make plausible that the defenses it has asserted to the FDIC's proof of claim in "clams" one and two are based on a written agreement that meets the requirements of § 1823(e). Accordingly, the FDIC's motion to dismiss "claims" one and two from the Adversary Complaint on grounds of § 1823(e) is denied. *See DiVall*, 69 F.3d at 1403-04 (finding that § 1823(e) did not bar defense based on violation of provision within written agreement that satisfied the requirements of § 1823(e)).

Unlike "claims" one and two, "claim" three appears to be based, at least in part, on an agreement for which JMJ has failed to allege facts sufficient to meet § 1823(e)'s requirements. "Claim" three seeks to void under 11 U.S.C. § 544 the Bank's security

interest that Bank obtained when JMJ allowed the Jacobses to grant the Bank a mortgage in JMJ's real property for their own benefit.  Both the FDIC and JMJ agree that for JMJ to have standing to set aside a fraudulent transfer under § 544, JMJ must be a creditor of the Jacobses.[12]  To establish that it is a creditor of the Jacobses, JMJ would have to show that it has a right to payment from the Jacobses.[13]  JMJ may have sufficiently pleaded that it is a creditor of the Jacobses.  JMJ's status as a creditor of the Jacobses, however, appears to be based on an agreement that JMJ has failed to allege meets § 1823(e)'s requirements.

JMJ has alleged that it "is a creditor of the Jacobs[es] by virtue of allowing the Jacobs[es] to mortgage its real property for their own benefit and use."  (Case No. A11-4184-TLS, Filing No. 1, ¶ 121.)  The FDIC contends that even if this allegation were true, it would not necessarily establish that JMJ has a right to payment from the Jacobses.  The FDIC contends that the Adversary Complaint is deficient because it lacks allegations that JMJ and the Jacobses entered into an agreement that provided JMJ with a right to payment from the Jacobses.  *See* Neb. Rev. Stat. § 36-702(3), (4).  From JMJ's allegations, it may reasonably be inferred that JMJ had a right to payment from the

---

[12]

Section 544 "arms the [debtor-in-possession] with the powers of an actual creditor with an allowable unsecured claim that could have avoided a transfer of the debtor's property or any obligation of the debtor under applicable (generally nonbankruptcy) law." 5 Collier on Bankruptcy ¶ 544.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  The applicable law JMJ appears to rely upon as providing it with the right to set aside the Bank's allegedly fraudulent transfers is Nebraska's Uniform Fraudulent Transfer Act ("UFTA"), Neb. Rev. St. § 36-701 *et seq.*  Under Nebraska law, "only a creditor has standing to bring an action to set aside an allegedly fraudulent conveyance."  *Wolf v. Degner*, 502 N.W.2d 440, 443 (Neb. 1993) (citing Nebraska's Uniform Fraudulent Conveyance Act, Neb. Rev. Stat. § 36-601 *et seq.*, *repealed by* Neb. Laws 1989, LB 423, § 13); *see also Eli's, Inc. v. Lemen*, 591 N.W.2d 543, 552 (Neb. 1999) (applying *Wolf* to the UFTA).

[13]*See* Neb. Rev. Stat. § 36-702(4) (defining the term "creditor" as "a person who has a claim."); Neb. Rev. Stat. § 36-702(3) (defining the term "claim" as " a right to payment.")

Jacobses.  *See Ritchie*, 630 F.3d at 716 (quoting *Iqbal*, 129 S. Ct. At 1940).  However, this inference requires the assumption that JMJ and the Jacobses entered into some agreement under which, in exchange for permitting the Jacobses to mortgage JMJ's property for their own benefit, JMJ received a right to payment from the Jacobses.  JMJ has failed to allege any facts indicating that such an agreement met § 1823(e)'s requirements, and voiding the Bank's security interest in the property underlying the trust deed would decrease the FDIC's interest in that underlying property.  Accordingly, the FDIC's Adversary MTD is granted as it relates to "claim" three because it is barred by § 1823(e).

## CONCLUSION

FIRREA's administrative exhaustion requirement applies only to JMJ's equitable subordination claim (claim four) asserted in the Adversary Complaint against the FDIC as receiver.  JMJ has failed to plead facts sufficient to establish that an agreement on which its "fraudulent transfer claim" ("claim" three) is based meets the requirements of 12 U.S.C. § 1823(e).

Accordingly,

IT IS ORDERED:

1.    The Objection to Claim (Case No. BK11-40267-TLS, Filing No. 43) is denied;

2.    The Motion to Dismiss Adversary Proceeding (Case No. A11-4184-TLS, Filing No. 11) is granted in part, and denied in part, as follows:

      a.    "Claim" three, titled "Fraudulent Transfer" in the Adversary Complaint (Case No. A11-4184, Filing No. 1), is dismissed;

26

b. "Claim" four, titled "Equitable Subordination" in the Adversary Complaint (Case No. A11-4184, Filing No. 1), is dismissed;

c. The Motion to Dismiss Adversary Proceeding (Case No. A11-4184-TLS, Filing No. 11) is otherwise denied;

3. The Motion to Amend Memorandum and Order (Filing No. 48) is denied as moot; and

4. The Federal Deposit Insurance Corporation shall have until February 27, 2012, to file a responsive pleading to the Adversary Complaint (Case No. A11-4184-TLS, Filing No. 1) filed by JMJ Land, LLC.

DATED this 13th day of February, 2012.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge

27